IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 24, 2024

**STATE OF TENNESSEE v. STEVEN LAWRENCE SABO[1]**

**Appeal from the Criminal Court for Claiborne County
Nos. 2022-CR-3859, 2020-CR-5768   Zachary R. Walden, Judge**

_____

**No. E2023-01695-CCA-R3-CD**

_____

The Defendant, Steven Lawrence Sabo, appeals from the Claiborne County Criminal Court's probation revocation of the eight-year sentence he received for his felony theft conviction.  On appeal, the Defendant contends that the trial court abused its discretion by (1) revoking his probation and ordering him to serve the remainder of his sentence in confinement and (2) ordering consecutive service of the revoked sentence with the sentence for a subsequent attempted aggravated assault conviction.  We affirm the judgments of the trial court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and JILL BARTEE AYERS, J., joined.

Leif Ericson Jeffers, District Public Defender; Mitchell A. Rains (on appeal), Assistant Public Defender – Appellate Division; Robert Scott (at hearing), Assistant Public Defender, for the appellant, Steven Lawrence Sabo.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Jared Effler, District Attorney General; and Carla Brewer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The record reflects that in Union County case number 2020-CR-5768, the Defendant was convicted of felony theft on April 12, 2021, and that the Defendant received

---

[1] The Defendant's name appears various ways in the record.  We use the name as it appears in the indictment in case number 2022-CR-3859.

a sentence of eight years' probation after eight months in confinement.[2]  In June 2022, the Defendant was indicted in Claiborne County case number 2022-CR-3859 for aggravated kidnapping and aggravated assault by strangulation.  On August 22, 2022, a probation violation warrant issued in Union County case number 2020-CR-5768 and alleged that the Defendant had violated the rules of probation by committing the new offense of aggravated assault in August 2022 and by engaging in assaultive, abusive, intimidating, or threatening behavior.  On August 14, 2023, the Defendant pleaded guilty in case number 2022-CR-3859 as a Range III, persistent offender to attempted aggravated assault, a Class D felony, with the trial court to determine the length and manner of service of the sentence.

The guilty plea transcript in Claiborne County case number 2022-CR-3859 reflects that the parties stipulated that "on or about August 6th, 2022, in Claiborne County, Tennessee, the defendant, Steven Lawrence Sabo, did unlawfully, feloniously, knowingly and intentionally or recklessly attempt to cause bodily injury to [the victim] by strangulation."  Following the guilty plea hearing, the Union County probation revocation proceeding and the Claiborne County sentencing hearing were consolidated and held in the Claiborne County Criminal Court.

At the November 13, 2023 consolidated hearing, the presentence report was received as an exhibit.  The report reflects that the forty-five-year-old Defendant had previous convictions for two counts of driving while his license was revoked, resisting arrest, possession of a Schedule II controlled substance, three counts of evading arrest with the risk of death, reckless endangerment involving a deadly weapon, five counts of felony theft, possession of cocaine, possession of synthetic cannabinoid, identity theft, tampering with evidence, evading arrest, two counts of burglary not related to a habitation, five counts of forgery, two counts of misdemeanor theft, shoplifting, criminal impersonation, three counts of misdemeanor drug possession, domestic violence, willful obstruction of law enforcement, "no driver's license," driving under the influence, public intoxication, and underage consumption of alcohol.  The report, likewise, reflects the Defendant's previous probation revocations in two cases.

The presentence report reflects that the Defendant left high school in the twelfth grade to obtain employment but that he wanted to further his education.  He reported having no mental health illnesses and excellent physical health.  He reported completing a court-order treatment program called "C.C.S." in Kingsport, Tennessee, in 2013.  He reported first drinking alcohol or using drugs at approximately age sixteen and said that his longest period of sobriety was from 2018 to 2023.  He reported having family and employment

---

[2] The October 9, 2023 presentence report reflects the conviction offense and sentence in the Union County case.  The record is absent any other information, including the judgment and transcripts from the conviction proceeding and sentencing hearing.

conflicts, along with legal problems, because of his previous drug use. During the six months before the presentence investigation, the Defendant reported having used alcohol one to three times per month and having used marijuana, heroin, and cocaine a "few times." He said he could pass a drug screen. He reported a good relationship with his mother, sister, and uncles. The Defendant reported fulltime employment at the time of his arrest. The Strong-R Assessment reflects a risk level of "high property."

Certified copies of some of the Defendant's previous convictions were received as an exhibit. On November 3, 2014, he was convicted of tampering with evidence, burglary, felony theft, and misdemeanor evading arrest. On March 2, 2015, he was convicted of identity theft and felony theft. On December 9, 2019, he was convicted of possession of less than 0.5 gram of cocaine, resisting arrest, driving while his license was suspended, and evading arrest with a motor vehicle. On January 15, 2020, he was convicted of evading arrest by using a motor vehicle, felony reckless endangerment, and driving with a suspended license, second offense. On January 20, 2020, he was convicted of evading arrest by using a motor vehicle. On August 19, 2020, he was convicted of felony theft. On April 12, 2021, he was convicted of felony theft. The Defendant was likewise convicted of various misdemeanor theft-related offenses.

The victim of the assault-related conviction testified that at the time of the offense, she lived with the Defendant and his mother and that she and the Defendant were in a romantic relationship. She said that the first couple of months of their relationship was "good," that the Defendant "started disappearing," and that toward the end of their relationship, the Defendant began accusing her of "cheating" and "sneaking guys into the bedroom." She said that the Defendant "only wanted to hear one thing . . . , and it wasn't anything [she] had to say."

The victim testified that on the day of the incident, the Defendant took an old cell phone, "put a camera on it and set it up in the bedroom," and accused her of having "people in the bedroom" with her. She said that the Defendant scared her, that he screamed into the phone, that he came home during his lunch break from work, and that he "knocked the hell out of [her]." She said that she had been asleep when the Defendant called and that when the Defendant arrived home, he "jumped" out of the car, ran inside the house, and began hitting her. She said that her glasses "fell off" her face during the incident. She said that the Defendant's uncle was at the home, that the uncle attempted to intervene, and that the Defendant's mother's home health nurse was in the bathroom during the incident. She said that the Defendant "got tired of it, packed a bag, and left." She said that he returned to the home the next day, that she was talking on the telephone to her best friend when he arrived, that she begged her friend to come and pick her up, and that he "screamed into the phone, yeah, you better come and get her before I kill her." The victim stated that the Defendant began removing her belongings from the bedroom, that she went to gather her

belongings, and that the Defendant "got [her] into the spare bedroom" corner and began striking her arm "really bad." She said that her injuries required medical treatment the next day. She said that, because the Defendant was with her at the hospital, she lied to the staff about how the injuries occurred. She said that after she and the Defendant left the hospital, they argued and that the Defendant nearly caused a motor vehicle crash.

The victim testified that they fought after they arrived home from the hospital and that the Defendant threw her cell phone on the concrete, which shattered the screen. A photograph of her damaged phone was received as an exhibit. She said that the Defendant left but returned at 5:00 a.m. and that they argued and fought. She said that he attempted to "shove his phone" in her face and that he wanted her to look at the video recording, which he claimed showed her in the bedroom "sneaking somebody in and out of the window." She said that the Defendant placed his arm around her and began choking her. She recalled that the commotion woke the Defendant's mother, that his mother screamed at them from another bedroom, and that his mother's screams resulted in his releasing her. She said that the Defendant began drinking alcohol and that in the evening, the Defendant "beat the living hell out" of her. She said that her phone was her only means of communication and that she was scared she was not going to "get out" of the situation. She said the incidents occurred in the presence of her service dogs. She said that the Defendant eventually "passed out" from the alcohol, that the next morning the Defendant's uncle came to the home, and that she told the uncle, "[G]et in the car, get in the car, get in the car now." She said that she grabbed her purse and glasses and that she left the home barefoot wearing her nightgown. She said she left her belongings and her service dogs behind.

The victim testified that the Defendant's uncle drove her to meet her best friend, who drove her to the hospital. The victim said that before she entered the hospital, her friend photographed her injuries. The photographs were received as an exhibit. Referring to the photographs, she stated that her mouth was "busted" and her bottom tooth was "knocked . . . out" when the Defendant punched her and that she sustained scrapes to her right arm when he dragged her "back to the house," after she ran from him. She said that other photographs showed injuries to her mouth, including a missing top tooth, which occurred when the Defendant "smacked [her] so hard dragging [her] back down the road." The victim said that three teeth were knocked out during the incident and that her upper teeth were broken. Referring to other photographs, she said that the Defendant "blacked" her left eye but that she did not recall whether the injury was caused by a metal walker, the Defendant's fist, or his open hand. Additional photographs showed a "severely blacked" and swollen right eye, which the victim said resulted from the Defendant's fist. Referring to additional photographs, the victim said that she, likewise, sustained abrasions, bruises, and swelling to her arms and legs; that her hair became matted because the Defendant continually grabbed her hair while striking her; and that her back was injured when the Defendant struck her with the metal walker. She said that it took eight days to remove the

knots from her hair, that a "clump of hair" came out during the process, and that she provided the hair to a police officer at the first court appearance in the connection with this case.

The victim testified that additional photographs, which were received as an exhibit, were taken at the hospital by law enforcement. The photographs reflected the victim wearing a neck brace and abrasions on her arms and legs. The victim stated that after her release from the hospital, she photographed her injuries during a two-week period. The photographs, which reflected the changing nature of her injuries, were received as an exhibit. The victim stated that after her discharge from the hospital, additional bruises appeared on her face, her black eyes became darker and more swollen, and her knee became swollen.

The victim testified that her three registered service dogs provided emotional support and anxiety relief and that they were important to her life. She said that during the assault, the dogs were inside their crates. She identified a photograph of one dog crate and stated that it had been "dented in from where we were fighting and arguing." She recalled that while the dogs were inside their crates, the Defendant yelled and screamed at the dogs, kicked a crate, slammed the crate into another crate, and "slammed them into the wall." She said that although she left the dogs at the home, she was able to take possession of the dogs after being placed in a domestic violence shelter.

The victim testified that initially after the incident, she stayed with her best friend. She said that after the Defendant was released on bond, he convinced her to return to his home. She said that less than one week later, she decided to end the relationship because she "just couldn't do it" and that she told the Defendant she would attempt to have the charges dismissed. She said, though, she only wanted to collect her belongings from the home. She said that after she returned to her friend's house, the Defendant found her, harassed her, and watched her at the friend's home and at the bus stop. She said that as a result of the Defendant's behavior, she contacted the Defendant's probation officer and told the officer that "something has gotta be done, like I can't even walk outside. I'm afraid of him being in the alley or anything." She said that at this time, she was able to find placement at a domestic violence shelter in Knox County. She said that she did not sleep well "anymore because of this" and that her dogs were now "trigger[ed]" by men. She said that since the incident, she had continued to be treated for pain and "went from having mini seizures to having full blown seizures." She said that she had not obtained treatment for the injuries to her mouth and teeth because she lacked insurance and financial means.

Upon questioning by the trial court, the victim testified that the injuries to her neck ultimately were only muscular and that no bones were broken. She said that the Defendant's harassment while she stayed at her friend's house occurred while the

Defendant was released on bond in connection with this case. She said she did not incur any expenses during her stay at the domestic violence shelter and that her dogs were boarded at no expense to her other than the dogs' food and other necessities.

On cross-examination, the victim testified that the Defendant did not ask her to leave the home when their relationship "started going downhill" and that she attempted to leave multiple times.

Probation Officer Brad Short testified that on October 29, 2020, he began supervising the Defendant in connection with a Knox County case in which the Defendant received a two-year sentence. Mr. Short stated that he later learned the Defendant received a four-year probationary sentence in Greene County related to 2019 convictions for evading arrest, possession of a Schedule II controlled substance, and driving while his license was suspended. Mr. Short said the Greene County probation predated the Knox County probation. Mr. Short said that in addition to probation in Knox and Greene Counties, on April 12, 2021, the Defendant began serving an eight-year sentence on probation in Union County case number 2020-CR-5768 for a felony theft conviction. Mr. Short said that at the time of the consolidated hearing, he had been supervising the Defendant's probation in all three counties. Mr. Short stated that a probation violation warrant had not yet been issued in Greene County but that he was "[i]n the process" of submitting the warrant.

Mr. Short testified that at the time of the assault against the victim, the Defendant was on probation in Union and Greene Counties but that the sentence in the Knox County case had expired. Mr. Short said that this was the Defendant's first probation violation allegation in Union County since Mr. Short began his supervision. Mr. Short explained that the basis for the probation violation was the "threatening, intimidating behavior" stemming from the assault against the victim. Mr. Short said that the victim's testimony regarding the Defendant's contacting her after his release was not a basis of the probation violation.

Mr. Short testified that he reviewed the Defendant's Tennessee Department of Correction (TDOC) record, which he said reflected that the Defendant began serving a sentence on probation on June 3, 2009; that this probation was revoked on August 2, 2010; that he was released on parole on April 4, 2011; that his parole was revoked on January 31, 2013; and that his sentence expired on April 12, 2017. The TDOC record reflected that the Defendant began serving a sentence on probation in Greene County on December 9, 2019; that he was granted determinate release on October 29, 2020; and that he reported to the probation office for intake on December 23, 2020.

Mr. Short testified that in connection with Union County case number 2020-CR-5768, the Defendant was sentenced on April 12, 2021, that he served eight months' confinement, and that Mr. Short supervised the Defendant between December 23, 2020, and April 12, 2021. Mr. Short said that the Defendant was released from the Union County jail on November 2, 2021, after serving eight months. Mr. Short said that the Defendant was arrested in connection with Claiborne County case number 2022-CR-3859 based upon the assault against the victim on August 7, 2022, which violated his probation.

Upon questioning by the trial court, Mr. Short testified that in the Union County case, the Defendant was sentenced to eight years as a Range III, persistent offender. Mr. Short said the Defendant had been in custody since September 15, 2022.

On cross-examination, Mr. Short testified that on December 23, 2020, he began supervising the Defendant and that the only probation violation was related to the assault against the victim. Mr. Short agreed that the Defendant reported to the probation office as instructed, did not fail any drug screens, and maintained employment. Mr. Short said that during their meetings, the Defendant was respectful and had a good attitude.

The Defendant testified that between 2009 and 2018, he struggled with drug abuse but that after the Greene County conviction, he "decided it was time to change." He said that he had been sober since 2018. He said that although his criminal history showed drug- and theft-related convictions, he had not been charged with assault before the incident involving the victim.

The Defendant testified that his and the victim's relationship "started off good" but that he noticed a change in her. He admitted he placed a camera in their bedroom and said he "caught her in there with someone." He said that as a result, he began "drinking a little bit here and there." He said he "wished" the assault had never happened, that he wished he "could take it back," and that he was "not that kind of person." He said that although he "had a bad past," he was not "mean" and that he had worked "hard the past few years to straighten [up his] life."

The Defendant asked the trial court to return him to probation and stated that he could successfully complete probation. He said that he could not "believe [he] lost control like that" with the victim. He said that he never missed an appointment with his probation officer or failed a drug screen, that he was employed while on probation, and that he made regular payments toward court costs and fines, although he was "a little bit behind." He said that if the court returned him to probation, his employer would rehire him.

Upon questioning by the trial court, defense counsel stated that the Defendant "would submit" to the probation violation allegation.

Upon further questioning by the trial court, the Defendant testified that he did not attend a rehabilitation program or meetings to "get clean." The Defendant said he relied upon "the help of the Lord." He said he "never really was a drinker." He said that he only "had . . . that little bit . . . and just because [he] couldn't stand to go home, and I couldn't sleep in my bedroom . . . without seeing what I had seen on camera. . . ." When asked if he had participated in any twelve-step program, the Defendant said that in 2013, he "went to CCS in Kingsport for [his] drug use," that it was a thirty-day program, and that his participation was court ordered. He said that during the time he was "getting clean," he did not speak with a counselor or pastor and that sobriety was achieved through his own "religious experience."

On cross-examination, the Defendant testified that he had been convicted of underage alcohol consumption at age eighteen. He denied that he had a problem with alcohol. He said that he "stayed out of trouble" through his twenties but agreed that he had convictions during his thirties and forties. However, he later admitted he had convictions in his twenties. He agreed he had been charged with offenses in Bryan, Georgia, during his twenties but said that the charges were dismissed. He said that additional charges in his twenties related to burglary, theft, domestic assault, and criminal impersonation were dismissed. He agreed that he had convictions for driving while his license was suspended and for failure to stop at the scene of an accident in his late twenties. He said that he completed a sentence on probation in his late twenties for possession of drug paraphernalia. He clarified that when he referred to staying out of trouble in his twenties, he meant felony charges.

The Defendant testified that he had approximately twelve or thirteen felony convictions and that it was possible he had eight misdemeanor convictions. He disputed that he had been committing crimes most of his life and said that "[m]ost of the criminal charges were committed . . . at one time[.]" He said, though, that he would not dispute the contents of the certified copies of his convictions and agreed that he had a significant previous criminal history, which included burglary, evading arrest, and reckless endangerment.

The Defendant testified that the incident involving the victim stemmed from his belief that she was unfaithful and that, regardless of whether his belief was true, he had the opportunity to handle the situation differently. He said that before the incident occurred, he asked the victim to leave but that she refused because she had nowhere to go and because his mother would not force her to leave. He agreed that he "snapped" because of his anger or jealously.

On redirect examination, the Defendant testified that although he had previously relied upon his faith for recovery, he was "open" to professional help to further his recovery. The Defendant requested the trial court's mercy.

The trial court considered the evidence at the hearing, including the exhibits, the witness testimony, the presentence report, the certified judgments of conviction, and the risk and needs assessment. The court likewise considered the principles of sentencing, arguments by counsel, mitigating and enhancement factors, and statistical information provided by the Administrative Office of the Courts.

The trial court found, in connection with Union County case number 2020-CR-5768, that the Defendant had "submitted" to the probation violation and that he committed a nontechnical violation based upon the new felony conviction related to the assault against the victim. *See* T.C.A. § 40-35-311 (2019).

In determining the disposition of the probation violation and the sentence for the attempted aggravated assault, the trial court noted the Defendant's extensive criminal history and "clear record of substance abuse." The court found that the Defendant had a positive social history based upon his familial connections and that he had the ability to maintain employment. The court found, based upon the risk and needs assessment, that the Defendant was "a high risk individual . . . primarily based on the many . . . convictions" for property-related crimes. The court found that the assessment also showed that the Defendant had "high needs" for education and family, along with "moderate needs for both residential and aggression."

The trial court declined to apply mitigating factors. *See* T.C.A. § 40-35-113 (2019). The trial court found that enhancement factors (1), (5), (8), and (13) applied. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"); -114(5) ("The defendant treated . . . a victim . . . with exceptional cruelty during the commission of the offense[.]"); -114(8) ("The defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community[.]"); -114(13)(C) ("At the time the felony was committed . . . the defendant [was] . . . [r]eleased on probation[.]"). The court gave "great weight" to the Defendant's previous criminal history and noted the "pervasive" nature of the convictions throughout the Defendant's life. The court found that the convictions did not occur during one or two incidents and that the convictions involved multiple incidents of criminal conduct. The court found that the Defendant treated the victim with the "type of cruelty" that went "beyond" that necessary to complete an assault. The court credited the victim's testimony about the extent of her injuries and noted the photographs of her in a neck brace and with scrapes, bruises, cuts, and bumps. The court found that the "physical assault . . . pale[d] in comparison to the

physical torture," determining the assault spanned multiple days. The court noted the Defendant's "inappropriate surveillance" of the victim in their shared bedroom and found that the service animals present during the assault were "ruined" and "burned" for their service functions. The court found that the Defendant's inability to comply with the conditions of probation was "apparent" from the Defendant's previous criminal history and applied "a good bit of weight" to this failure. The court found that the Defendant was on probation in the Union County case at the time of the assault and "[gave] weight" to this factor.

In connection with consecutive sentencing, the trial court found that the Defendant was an offender whose record of criminal activity was extensive. *See id*. § 40-35-115(b)(2) (2019). The court noted that the offense against the victim was the Defendant's third felony conviction in a short period of time and that the Defendant's previous convictions spanned a significant portion of the Defendant's life. The court stated that it had to consider public safety. The court, likewise, found that the Defendant committed the assault while serving a sentence on probation. *See id* § -115(b)(6).

The trial court found that the assault was a serious offense and discredited the Defendant's testimony that he was "upset at something in the moment." The court found that the "multi-day event" required preparation, that the incident began with the Defendant's suspicion of the victim, that he placed and concealed a camera in their bedroom, and that he reviewed the recording. The court rejected the Defendant's testimony that he went into "a fit of rage" and found that the incident was not the result of "provocation of [a] passionate moment where someone made a mistake." The court found that the Defendant "chose" to harm the victim during a three-day period. Regarding deterrence, the court determined that it was necessary to deter defendants on probation from committing new violent offenses. The court found that confinement was necessary to protect society from the Defendant due to his long criminal history and noted that the conduct had become "worse and worse instead of better." *See id*. § 40-35-103(1)(A) (2019). The court noted that although the Defendant was willing to undergo substance abuse treatment, he had struggled with drug abuse most of his life and only obtained treatment once. The court found that the Defendant was not a suitable candidate for probation. The court, likewise, found that confinement was necessary to avoid depreciating the seriousness of the offense and noted that "domestic abuse was a very serious issue." *See id*. § 40-35-103(1)(B). The court determined that confinement was also necessary because although the Defendant had received probation previously and recently, the Defendant had failed to succeed by committing a violent offense. *See id*. § 40-35-103(1)(C).

Based upon the trial court's findings and determinations, it revoked the Defendant's probation and ordered him to serve the remainder of his eight-year sentence in confinement with credit for any time previously served in confinement. In connection with the attempted aggravated assault conviction, the trial court imposed an eight-year sentence and ordered consecutive service with the eight-year sentence in the revocation proceeding. The court prohibited the Defendant from having any contact with the victim. This appeal followed.

The Defendant contends in Union County case number 2020-CR-5768 that the trial court erred by revoking his probation and ordering him to serve the remainder of his sentence in confinement. Although the Defendant does not challenge the trial court's sentencing determinations regarding the length and manner of service of the eight-year sentence in Claiborne County Case number 2022-CR-3859, he argues that the trial court erred by imposing consecutive service with the revoked sentence. The State responds that the trial court did not abuse its discretion by ordering the Defendant to serve his sentence and by ordering consecutive service. We agree with the State.

## I.    Probation Revocation

"On appeal from a trial court's decision revoking a defendant's probation, the standard of review is abuse of discretion with a presumption of reasonableness so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." *State v. Dagnan*, 641 S.W.3d 751, 759 (Tenn. 2022). An abuse of discretion has been established when the "record contains no substantial evidence to support the conclusion of the trial judge that a violation of the conditions of probation has occurred." *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980); *see State v. Shaffer*, 45 S.W.3d 553, 554 (Tenn. 2001); *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *Shaffer*, 45 S.W.3d at 555 (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

When a trial court determines that a defendant's probation must be revoked, the court must then decide upon an appropriate consequence. *Dagnan*, 641 S.W.3d at 757. A separate hearing is not required, but the court must address the issue on the record in order for its decision to be afforded the abuse of discretion with a presumption of reasonableness standard on appeal. *Id*. at 757-58.

After revoking a defendant's probation, the trial court may return a defendant to probation with modified conditions as necessary, extend the period of probation by no more than one year upon making additional findings, order a period of confinement, or order the

defendant's sentence into execution as originally entered. T.C.A. §§ 40-35-308(a), (c) (Supp. 2022), -310 (Supp. 2022). "In probation revocation hearings, the credibility of witnesses is for the determination of the trial judge." *Carver v. State*, 570 S.W.2d 872, 875 (Tenn. Crim. App. 1978) (citing *Bledsoe v. State*, 387 S.W.2d 811, 814 (Tenn. 1965)).

The record reflects that the Defendant did not dispute violating the conditions of his probation as alleged in the probation violation warrant. While serving his eight-year sentence on probation, the Defendant was arrested for, and later pleaded guilty to, attempted aggravated assault. The evidence established that the Defendant violently assaulted the victim during a multi-day incident. The trial court credited the victim's testimony regarding the violent nature of the assault, and the photographs of her injuries were consistent with her testimony. As a result, the trial court did not abuse its discretion by revoking the Defendant's probation.

The record, likewise, supports the trial court's determination to order the Defendant to serve the remainder of his probationary sentence in confinement. The court spent a significant portion of the hearing considering the Defendant's previous criminal convictions and determined that the Defendant's criminal conduct had spanned a large portion of the Defendant's life. The court, likewise, found that the Defendant had violated the conditions of probation in previous cases and that the Defendant's inability to comply with the conditions of his release was "apparent" from his criminal history. The court concluded that the Defendant's criminal history, previous failed attempts at probation, and the safety of the community warranted the Defendant's serving the remainder of the sentence in confinement. The court did not abuse its discretion by ordering the remainder of the sentence into execution. The Defendant is not entitled to relief on this basis.

## II.    Consecutive Service

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(8) (Supp. 2022). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The trial court ordered consecutive service of the Defendant's two eight-year sentences after determining that the Defendant had an extensive record of criminal activity and that the Defendant committed the assault against the victim while serving a sentence on probation. *See* T.C.A. § 40-35-115(b)(2), (6). The court found that the certified copies of the Defendant's convictions, along with additional convictions detailed in the presentence report, reflected that the Defendant had an extensive criminal history that spanned a significant portion of his life. The Defendant's convictions included resisting arrest, reckless endangerment with a deadly weapon, drug- and theft-related offenses, burglary, domestic violence, evading arrest, and identity theft. Likewise, the record reflects that the Defendant was serving a sentence on probation at the time of the assault against the victim. The record supports the trial court's determinations.

Further, the trial court considered the principles of sentencing when ordering consecutive service. Regarding the nature of the assault, the court found that the Defendant treated the victim with exceptional cruelty during the assault that lasted multiple days. The court found that the assault required preparation and planning and was not the result of passionate provocation as the Defendant testified. The court determined that in addition to avoid depreciating the serious nature of the assault, deterrence was needed to prevent other probationers from committing violent offenses. The court concluded that the Defendant's criminal history, previous failed attempts at probation, the nature of the offense, deterrence, and public safety warranted consecutive service. The court did not abuse its discretion by ordering consecutive service. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE